*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

OMAR AKEEM AMOS,

        Plaintiff-Appellee,

and

MICHIGAN HEAD & SPINE INSTITUTE, P.C., and
ASCENSION ST. JOHN HOSPITAL,

        Intervening Plaintiffs-Appellees,

v

PROGRESSIVE MARATHON INSURANCE
COMPANY,

        Defendant-Appellant,

and

FARMERS INSURANCE EXCHANGE and USAA
CASUALTY INSURANCE COMPANY,

        Defendants.

UNPUBLISHED
July 13, 2023

No. 360091
Wayne Circuit Court
LC No. 20-012063-NF

OMAR AKEEM AMOS,

        Plaintiff-Appellee,

and

MICHIGAN HEAD & SPINE INSTITUTE, P.C.,
and ASCENSION ST. JOHN HOSPITAL,

        Intervening Plaintiffs-Appellees,

v

PROGRESSIVE MARATHON INSURANCE
COMPANY and FARMERS INSURANCE
EXCHANGE,

No.   360098
Wayne Circuit Court
LC No.   20-012063-NF

            Defendants,

and

USAA CASUALTY INSURANCE COMPANY,

            Defendant-Appellant.

Before:  RICK, P.J., and SHAPIRO and LETICA, JJ.

LETICA, J. (*dissenting*).

I respectfully dissent.  The circuit court erred when it denied Progressive and USAA's motions for summary disposition and subsequent motions for reconsideration because there was no genuine issue of material fact on this record that plaintiff Omar Amos (Omar)[1] was willfully operating a motor vehicle he unlawfully took from his mother Venus and that he knew or should have known he took it unlawfully.

## I.  FACTUAL BACKGROUND[2]

On Sunday May 24, 2020, the day before Memorial Day, Venus went to bed at about 8:30 p.m.  Thirty-two-year-old Omar recalled taking the 8-Mile Grand River bus to Venus's house[3] as the sun was setting.[4]  By 10:12 p.m., a crash involving Venus's vehicle was reported to police.  Omar, whose driver's license had been suspended for years, had been driving Venus's vehicle.

---

[1] To distinguish plaintiff Omar Amos from his mother Venus Amos (Venus), I refer to them by their first names.

[2] I agree with the majority's recitation of the procedural background and its standard of review.

[3] Omar testified that he spent his time equally between the homes of his mother and the mother of his child.  Earlier, however, Omar told a Progressive employee that he did not often stay at Venus's home, perhaps "once every two weeks or something like that."  In deciding a motion for summary disposition under MCR 2.116(C)(10), this Court views conflicting evidence "in the light most favorable to the nonmoving party." *Ahmed v Tokio Marine America Ins Co*, 337 Mich App 1, 7-8; 972 NW2d 860 (2021) (quotation marks and citation omitted).

[4] Although no additional information was provided about when Omar arrived on the bus or when the sun set, governmental records reflect sunset occurred at 8:56 p.m. <https://gml.noaa.gov/grad/solcalc/sunrise.html> (accessed July 5, 2023).  See MRE 201.

Omar rear-ended a vehicle stopped for a red light, jumped a curb, and toppled a light pole before striking a building. Two additional adult occupants in Venus's vehicle, Omar's female acquaintance and her brother, fled after the crash. The acquaintance's brother returned to the scene and was transported to the hospital. Omar was seriously injured and subsequent hospital testing showed that he was positive for tetrahydrocannabinol (THC) and had a 0.171 blood-alcohol level, twice the legal limit.

During Venus's subsequent deposition, she testified she purchased that vehicle in February 2018. Venus had two sets of keys, which she typically kept in her bag or in a safe place, usually her bedroom dresser. But, on the date of the accident, Venus felt unwell and she could have put the keys anywhere. During Omar's deposition, Omar testified that he did not have keys to Venus's vehicle and that if he wanted to take and use it, he had to get the keys from Venus. Omar told a Progressive employee that he saw Venus's keys on the table on the night of the accident and took them.

Before the accident, Omar did not keep count of the number of times he had driven Venus's vehicle, but it was "[n]ot that many." When offered the option of choosing whether he had driven the vehicle once or twice or "a handful of times" or on a "regular basis," Omar responded: "I'll just go with a handful."[5] When asked why he was permitted to use the car on those occasions, Omar responded "the main number one reason" was "to spend some time with [his] son."[6]

Omar also testified that "before using" Venus's vehicle, he had to ask her for permission to do so. And when questioned about whether he had to ask for permission "each time" he "wanted to take and use" Venus's vehicle, Omar answered: "Absolutely. Yes." Omar further testified that there was never a time he took Venus's vehicle without asking Venus for permission. Yet, on the night of the accident, Omar frankly acknowledged that he did not seek Venus's permission to use her vehicle. Instead, he took the keys to Venus's vehicle from Venus's home while Venus slept, and drove off without her permission. Due to the accident, Omar could not recall the exact time he drove off in Venus's vehicle.

Venus confirmed Omar's understanding of when Omar could use her vehicle. When asked if it was "fair to say that if Omar wanted to borrow and use [Venus's vehicle] . . . he had to come and ask for [her] permission," Venus answered: "Yes." And Venus confirmed that Omar asked for her permission on those handful of occasions that he used her vehicle before the accident. Venus also confirmed that on the day of the accident Omar did not ask for permission before taking her vehicle because she was asleep. Finally, when asked if "Omar ever discussed with [Venus] that he knew he should not have taken" her vehicle, Venus testified that he had and that Omar "told [Venus] he was sorry for doing that."

---

[5] During an earlier telephone call with Progressive's representative, when offered the choice between "one to two" or "five or more times," Omar thought it was "one or two." See footnote 2.

[6] At Omar's deposition, he testified that his son was four; however, Omar did not provide a birthdate for the child. Because Omar's deposition was taken eight months after the accident, it is unclear whether the child was three or four years old when the accident occurred.

## II. APPLICABLE LAW

As the majority recognizes, in pertinent part, MCL 500.3113 provides:

A person is not entitled to be paid personal protection insurance [(PIP)] benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:

(a) The person was willingly operating or willingly using a motor vehicle or motorcycle that was taken unlawfully, and the person knew or should have known that the motor vehicle or motorcycle was taken unlawfully. [MCL 500.3113(a).]

Our Supreme Court has held that "any person who takes a vehicle contrary to a provision of the Michigan Penal Code—including MCL 750.413 and MCL 750.414, informally known as the 'joyriding' statutes—has taken the vehicle unlawfully within the meaning of MCL 500.3113(a)." *Spectrum Health Hosps v Farm Bureau Mut Ins Co*, 492 Mich 503, 537; 821 NW2d 117 (2012). Both joyriding statutes prohibit the taking of a motor vehicle without the authority of the owner. MCL 750.413; MCL 750.414. The term "authority' in the context of the joyriding statutes means "the 'right to control, command or determine.' " *Rambin v Allstate Ins Co*, 495 Mich 316, 332; 852 NW2d 34 (2014), quoting *Random House Webster's Dictionary* (1996), superseded by statute as recognized by *Ahmed v Tokio Marine America Ins Co*, 337 Mich App 1, 25; 972 NW2d 860 (2021). In relevant part, MCL 750.413 provides that "[a]ny person who shall, wilfully and without authority, take possession of and drive or take away . . . any motor vehicle, belonging to another, shall be guilty of a felony . . . ." MCL 750.414 similarly provides, in relevant part, that "[a]ny person who takes or uses without authority any motor vehicle without intent to steal the same . . . is guilty of a misdemeanor . . . ." Although MCL 750.414 "prohibits the unauthorized use or taking of a motor vehicle, it does not require a showing that the perpetrator intended to permanently deprive the owner of the vehicle." *Rambin*, 495 Mich at 329.

After *Rambin*, the Legislature amended MCL 500.3113(a). 2014 PA 489. The original version of the statute contained a safe harbor provision for one who unlawfully took a vehicle but "reasonably believed that he or she was entitled to take and use the vehicle." 1986 PA 93. In *Ahmed*, this Court concluded that MCL 500.3113(a), as amended, eliminated the safe harbor provision contained in the former version of the statute. *Ahmed*, 337 Mich App at 23. Under the new standard, it is no longer sufficient for a person seeking PIP benefits to show he lacked actual knowledge that he did not have authority from the owner to take the vehicle. *Id*. at 25. For purposes of applying MCL 500.3113(a), a person has unlawfully taken a vehicle under MCL 750.414 if the person did not take steps to determine whether the owner had granted him authority to take the vehicle.[7] *Id*. at 26-27.

---

[7] 2014 PA 489 only amended the scienter requirement for MCL 750.414 as it relates to litigation concerning the application of MCL 500.3113(a), and the legislation did not amend the mens rea necessary to prove a violation of MCL 750.414 in criminal cases. *Ahmed*, 337 Mich App at 26 n 12.

In *Ahmed*, the plaintiff was injured while driving a rental car and sought PIP benefits from the defendant. *Ahme*d, 337 Mich App at 4-5. The car was rented by the plaintiff's wife, who gave the plaintiff permission to drive the vehicle. *Id*. The plaintiff was not licensed to drive when the accident occurred. *Id*. at 5. Under the express terms of the contract, which the plaintiff never read, unlicensed drivers were expressly forbidden from driving the car. *Id*. Thus, the plaintiff was expressly not authorized to drive the car by the vehicle's owner, the rental car company, but he did not have actual knowledge that he lacked authority. *Id*. This Court concluded that, under the "should have known" standard, the plaintiff was obligated to learn the terms of the contract and could not merely assume he was permitted to take the car. *Id*. at 26-27. This Court explained that "[t]he mere assumption or supposition that it must be permissible to take a third party's property, without more, does not satisfy the 'should have known' standard of MCL 500.3113(a)." *Id*. at 27.

## III. ANALYSIS

In this case, the undisputed facts show that 32-year-old Omar, whose license to drive had been suspended for years,[8] was prohibited from taking Venus's vehicle on the day of the accident without her permission and that he knew or should have known his taking was prohibited.

Venus owned the vehicle, having purchased it in February 2018. Omar did not have keys to Venus's vehicle, and, if he wanted to take and use it, he had to get the keys from Venus. Despite knowing that Omar's license was suspended, Venus let Omar use her vehicle on a "handful" of occasions over 2-1/4 years to spend time with his young son.

Omar testified that "before using" Venus's vehicle, he had to ask her for permission. And, when asked whether he had to request permission "*each time*" he "wanted to take and use" Venus's vehicle, Omar answered: "*Absolutely. Yes.*"[9] (Emphasis added). Except for the night of the accident, Omar never took Venus's vehicle without asking Venus for permission. That night, Omar did not ask Venus for permission. Instead, he took the keys to Venus's vehicle from Venus's home while Venus slept and drove off. Because MCL 500.3113(a) "examines the legality of a taking from the *driver*'s perspective," *Spectrum Health*, 492 Mich at 522, this ends the inquiry of

---

[8] It is a crime for a vehicle owner to "knowingly permit . . . [her vehicle] . . . to be operated on a highway or other place open to the general public or generally accessible to motor vehicles . . . within this state by a person whose license . . . is suspended . . ., except as permitted under" the Motor Vehicle Code, MCL 257.1 *et seq*. See MCL 257.904(2). The penalty for that offense depends on the number of prior convictions for the same offense and whether it causes another person to suffer a serious impairment of body function or death. See MCL 257.904(3) and (7).

[9] Although the majority posits "that families often do not articulate hard-and-fast rules that must be followed in all circumstances," this family had a hard-and-fast rule in place. More specifically, Omar had to ask Venus for permission to use her vehicle and she had to give Omar express permission before he could drive her vehicle.

whether Omar unlawfully took Venus's vehicle without authority and whether he knew or should have known that he took it unlawfully.

In any event, Venus confirmed Omar correctly understood the condition under which he could use her vehicle. "[I]f Omar wanted to borrow and use" her vehicle, "he had to come and ask for [her] permission." And, in fact, Omar had asked Venus for her permission on those handful of occasions that he had used her vehicle before the accident. On the night of the accident, however, Omar did not ask Venus for permission before he took her vehicle because she was asleep. Finally, when she and Omar discussed that "he knew he should not have taken" her vehicle, Omar "told [Venus] he was sorry for doing that." In other words, Omar apologized to Venus for failing to obtain her approval to use her vehicle because he knew he should not have taken it before securing her permission.

Appellees,[10] however, argue that there was no unlawful taking in this case given Omar and Venus's subsequent affidavits and Venus's deposition testimony that she would have allowed Omar to take the vehicle that night if he had asked. In Omar's affidavit, he averred: "On the date of the accident, I was of the belief I had permission to use my mother's vehicle." In Venus's affidavit, she averred:

> 4. That Omar normally requested permission when using my vehicle. However, I did not require him to obtain permission before taking or using my vehicle.

> 5. . . . If Omar would have asked to use the vehicle I would have granted him permission to use my vehicle on May 24, 2020.

Because these affidavits directly conflicted with Omar and Venus's deposition testimony, namely, that Omar had to request permission from Venus before he used her vehicle, they cannot create a genuine issue of material fact. See *Dykes v William Beaumont Hosp*, 246 Mich App 471, 479-482; 633 NW2d 440 (2001) (It is well-established that a party may not create a question of fact by making assertions in an affidavit that are contrary to prior deposition testimony.).

Appellees also point to Venus's deposition testimony as demonstrating that Venus would have permitted Omar to take the vehicle that night if he had asked to do so. It is true that, during Venus's deposition, MSHI's attorney asked Venus whether, absent "psychic foreknowledge of this accident," she "would . . . have given [Omar] permission to use [her vehicle,]" if he had "woken [her] up that evening and asked to use" it. It is also true that Venus answered affirmatively.[11] Later, however, Progressive's counsel followed up on Venus's response, and Venus, who

---

[10] Appellees collectively refers to Omar and the service providers seeking recovery of PIP benefits.

[11] It appears that Venus was unaware that Omar was drinking or using marijuana before the accident. At Omar's deposition, Omar himself denied drinking alcohol or smoking marijuana on the day of the accident. After the accident, however, hospital test results showed that Omar was positive for THC and had a 0.17 blood-alcohol level, more than two times the legal limit.

recognized that Omar's driver's license was suspended,[12] further explained that she allowed Omar to take her vehicle "to go see his little boy." Venus then clarified that she would not have allowed Omar to take her car for any other reason.[13]

Regardless, before our Supreme Court's decision in *Spectrum*, 492 Mich at 523, an owner's statement after the accident that he or she would have given consent and allowed the driver to take the vehicle was one factor in determining whether there was an unlawful taking under MCL 500.3113(a). *Landon v Titan Ins Co*, 251 Mich App 633, 649; 651 NW2d 93 (2002). When *Landon* was decided, whether a vehicle owner had authorized a taking was determined by applying the test for whether consent had been given under the vehicle owner's liability statute, MCL 257.401, which presumes the owner gave his or her consent to the driver. *Bronson Methodist Hosp v Forshee*, 198 Mich App 617, 623-626; 499 NW2d 423 (1993), overruled by *Spectrum*, 492 Mich at 523. In *Spectrum*, our Supreme Court overruled *Bronson*, narrowing the circumstances under which a person can claim to have lawfully taken a vehicle and eliminating the presumption of consent for purposes of MCL 500.3113(a). *Spectrum*, 492 Mich at 523. Thus, even under the previous, more forgiving standard for determining the lawfulness of a taking, Venus's after-the-fact consent would not be dispositive in this case. Under the current version of MCL 500.3113(a), one runs afoul of MCL 750.414 when he takes a motor vehicle and knows or should have known that "the owner prohibited the taking." *Ahmed*, 337 Mich App at 25-26. And, again, the lawfulness of the taking is determined by whether the person was prohibited from taking the vehicle when the taking actually occurred. *Id*. at 13-15. In this case, Omar was prohibited from taking Venus's vehicle without obtaining her prior assent.

In denying appellants' motions for summary disposition, the trial court judge expressed his concern that Omar would be left without PIP benefits despite his serious injuries and explained that if the judge's child took his vehicle without his knowledge while he slept, he would be upset, but that it would not necessarily mean that he would not have permitted his child to take the vehicle. The trial court's hypothetical failed to recognize that the deposition testimony in this case established that this parent and adult "child" had a mutual understanding that this adult "child" was not permitted to take the car without asking this parent for permission, which this adult "child" failed to obtain, especially considering this adult "child's" status as a suspended driver.[14]

The majority seems to suggest that absent an express written agreement prohibiting driving altogether in a familial setting, permission is a fluid concept and an after-the-fact approval suffices. Doing so ignores Venus and Omar's straightforward deposition testimony. On this record, there is no dispute that Omar did not actually have Venus's permission to take her vehicle. Omar

---

[12] See footnote 8.

[13] Venus went to sleep around 8:30 p.m. and the vehicle crash was reported by 10:12 p.m. Omar was traveling on 8 Mile Road, a route he typically took to his son's home. The shortest distance between Venus's home and the home where Omar's child lived was over seventeen miles and required approximately thirty minutes to reach via vehicle. Omar's adult passengers were not deposed, and therefore, provided no additional information about whether Omar actually visited his three- or four-year-old son that night.

[14] See footnote 8.

unequivocally testified that he knew he needed his mother's prior permission before taking her vehicle, the same permission he had secured on those rare occasions when he had asked to use her vehicle over the course of more than two years. Nor could Omar simply assume that he had permission to take a vehicle from its owner. *Ahmed*, 337 Mich App at 27. And, even if Omar had assumed that Venus would have granted permission had he asked, the facts are that Omar knew that he needed Venus's permission to drive her vehicle each and every time and that he knew he took her vehicle without her permission while she was sleeping. Omar even apologized to Venus after they discussed that he should not have taken her vehicle without permission. Accordingly, Omar unlawfully took Venus's vehicle contrary to the joyriding statutes and was willingly operating it when the accident occurred, meaning Omar is barred from recovering PIP benefits pursuant to MCL 500.3113(a).

For these reasons, the trial court erred when it denied appellants' motions for summary disposition and reconsideration. I would reverse and remand to the circuit court with instructions to enter an order granting appellants' motions for summary disposition.


/s/ Anica Letica